IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| ACCRUENT, LLC, | § | |
|---|---|---|
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 1:17-CV-858-RP |
| | § | |
| JIM SHORT, | § | |
| | § | |
| Defendant. | § | |

## ORDER

Before the Court in the above-entitled matter is Plaintiff's Application for Temporary Restraining Order and Preliminary Injunction, (Dkt. 10). On September 14, 2017, the Court held a hearing at which it heard evidence and considered arguments on Plaintiff's request for a temporary restraining order ("TRO"). (Dkt. 25). The Court denied Plaintiff's request for a TRO and set a second hearing at which it would consider Plaintiff's request for a preliminary injunction. (*Id.*). The Court held the preliminary injunction hearing on December 19, 2017. (Dkt. 41). Having considered the parties' arguments, the evidence presented, and the relevant law, the Court **GRANTS** Plaintiff's application for a preliminary injunction to the extent described in this order.

## I. BACKGROUND

Plaintiff Accruent, LLC ("Accruent") is a company that provides software and services that help retail companies select and manage their real estate and facilities. (Appl. Prelim. Inj., Dkt. 10, ¶ 1). In early August 2017, Accruent acquired Lucernex, Inc., another software company that provides real estate- and facilities management products and services to retailers. (*Id.* ¶ 8).

Defendant Jim Short ("Short") was a Lucernex employee who became an Accruent employee after the acquisition. (Def.'s Resp. Appl. Prelim. Inj., Dkt. 16, at 6). Short had been working for Lucernex since March 2010, first as the director of client services until July 2012, then

1

as a solution engineer until July 2015, and then as the sole senior solution engineer until he resigned. (Short Decl., Dkt. 16-1, ¶ 7). As director of client services, Short's job was to implement Lucernex products for existing Lucernex customers. (Prelim. Inj. Hr'g, Dkt. 41 (Short testimony)). As a solution engineer, Short's job was to demonstrate Lucernex products for prospective cleints. (Dkt. 16-1, ¶ 7).

In each position, Short had access to a wide range of confidential proprietary information. Short's jobs required significant interaction with the software development team, the sales team, and the support team. (TRO Hr'g Tr., Dkt. 29, at 17 (Abdul testimony)). Short's experience implementing and demonstrating Lucernex's products gave him access to Lucernex's business development plans, product development plans, market research, sales strategies, software functionality and limitations, and customers' needs and preferences. (*Id.* at 21–23).

When he joined Lucernex, Short signed a "Proprietary Information and Inventions Agreement" ("Agreement"), which included nondisclosure, noncompete, and nonsolicititation provisions. (*Id.* at 18–20; Agreement, Dkt. 1-1, at 5–12). In the merger, Accruent acquired the right to enforce the Agreement against Short. (Dkt. 41 (Robb testimony)).

The Agreement's nondisclosure provision requires that Short not "disclose, discuss, transmit, use, lecture upon, or publish" any proprietary information as defined in the Agreement.[1] (Dkt. 1-1 § 2.1). The Agreement's employee nonsolicitation provision requires that Short not "solicit, assist, or in any way encourage" any Lucernex employee to stop working at Lucernex for two years after leaving the company. (*Id.* § 7.3). The Agreement's customer nonsolicitation provision requires that Short not solicit any Lucernex customers or interfere with Lucernex's customer

---

[1] The Agreement defines "proprietary information" as "information owned by the Company or licensed from third parties regarding (a) research, development, products, services, marketing, selling, business plans, budgets, unpublished financial statements, licenses, prices, costs, contracts and other agreements, suppliers, customers, and customer lists; (b) the identity, skills and compensation of employees, contractors, and consultants; (c) specialized training; and (d) information related to Inventions owned by the Company or licensed from third parties." (Dkt. 1-1 § 1.4). The Agreement also specifies that Lucernex would provide Short with proprietary information in exchange for his execution of the Agreement. (*Id.* § 2.1).

relationships for one year after leaving the company. (*Id.* § 7.4). And finally, the Agreement's noncompete provision requires that Short not "compete with the Company in Business" for two years after leaving Lucernex, either in Texas or any other state or country where Lucernex "engages or proposes to engage in Business." (*Id.* § 8). The Agreement defines "Business" as "those portions of the Company's business in which [Short] actively participated or received Proprietary Information." (*Id.*).

On August 19, 2017, Short accepted a position with Tango Management Consulting, LLC ("Tango"). (Dkt. 16, at 7). Short continued to work for Accruent until August 31 and then began working for Tango on September 1. (*Id.*). Tango competes directly with Accruent—it is a software company that helps retail companies select and manage real estate and facilities. (Dkt. 29, at 25 (Abdul testimony)). One Accruent executive described Tango as being directly in Accruent's crosshairs as a competitor and added that Tango had recently hired several employees away from Accruent. (Dkt. 41 (Rivera testimony)).

Tango hired Short as its director of services. (Dkt. 16-1, ¶ 21). In that role, Short helps existing Tango customers implement and use Tango software. (*Id.*). Short is not involved directly or indirectly with the Tango sales team and he does not interact with prospective Tango customers. (Tyagi Decl., Dkt. 22-1, ¶ 10). According to Tango, the company has barred Short from working for or contacting any Lucernex customers or prospects with whom he interacted for Lucernex. (*Id.* ¶ 8).

Four days after Short began working for Tango, Accruent filed this action against Short, alleging that Short breached the Agreement and requesting an injunction enforcing the Agreement. (Compl., Dkt. 1). Accruent then filed its application for a TRO and preliminary injunction on September 7, 2017. (Dkt. 10). The Court denied Accruent's request for a TRO, (Dkt. 25), but scheduled a preliminary injunction hearing, (Dkt. 35), and ordered a period of expedited discovery in

advance of the hearing, (Dkt. 36). Accruent presented evidence and arguments in favor of its request for a preliminary injunction at a hearing before the Court on December 19, 2017, (Dkt. 41).

## II. LEGAL STANDARD

A preliminary injunction is an extraordinary remedy, and the decision to grant such relief is to be treated as the exception rather than the rule. *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The party seeking injunctive relief carries the burden of persuasion on all four requirements. *PCI Transp. Inc. v. W. R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005).

## III. DISCUSSION

Accruent requests four kinds of injunctive relief. First, Accruent asks the Court to enjoin Short from disclosing or using Accruent's proprietary information. (Dkt. 10, at 10). Second, Accruent asks the Court to enjoin Short from soliciting Accruent employees for two years. (*Id.*). Third, Accruent asks the Court to enjoin Short from soliciting Accruent customers for one year. (*Id.*). Finally, Accruent asks the Court to enjoin Short from competing with Accruent for two years. (*Id.* at 10–11).

*A. Likelihood of Success on the Merits*

Accruent's lone cause of action against Short is a claim for breach of contract. (Dkt. 1, ¶¶ 23–27). To succeed on its motion for a preliminary injunction, then, Accruent must show that there was an enforceable noncompete/nondisclosure agreement and that Short is substantially likely to violate that agreement. *Henson Patriot Co., LLC v. Medina*, No. SA-14-CV-534-XR, 2014 WL 4546973, at *2 (W.D. Tex. Sept. 11, 2014). Short argues both (1) that the Agreement is

unenforceable and (2) that he is not violating the Agreement even if it is enforceable. (Dkt. 16, at 10–16).

## 1. Whether the Agreement is enforceable

In Texas,[2] "[e]very contract . . . in restraint of trade or commerce is unlawful." Tex. Bus. & Com. Code § 15.05(a). "An agreement not to compete is in restraint of trade and therefore unenforceable . . . unless it is reasonable." *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 681 (Tex. 1990). By statute, covenants not to compete are reasonable—and therefore enforceable—only to the extent that they contain "limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee." Tex. Bus. & Com. Code § 15.50(a).[3] "The hallmark of enforcement is whether or not the covenant is reasonable," *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 777 (Tex. 2011), and courts may "dispense[ ] with one or more factors entirely when the totality of circumstances indicate[ ] that the covenant not to compete [is] reasonably narrow to protect a company's business interest or goodwill." *M-I LLC v. Stelly*, 733 F. Supp. 2d 759, 799 (S.D. Tex. 2010).

If a court finds that a covenant is unreasonable, it must reform the covenant so as to render it reasonable. Tex. Bus. & Com. Code § 15.51(c). A court may reform an unreasonable covenant for the purpose of entering a preliminary injunction. *Tranter, Inc. v. Liss*, No. 02-13-00167-CV, 2014 WL 1257278, at *10 (Tex. App.—Fort Worth Mar. 27, 2014, no pet.) (stating that "reformation is not only a final remedy" and citing cases in which courts reformed covenants at the temporary-injunction stage).

---

[2] The Agreement provides that it is governed by Texas law. (Dkt. 1-1 § 15.1). The parties do not dispute that Texas law governs the construction, interpretation, and enforceability of the Agreement.

[3] Section 15.50(a) also requires that a covenant not to compete be "ancillary to or part of an otherwise enforceable agreement at the time the agreement is made," but the parties do not dispute that the Agreement meets this requirement.

5

Short argues that the Agreement is unenforceable on a number of grounds.[4] First, Short argues that the Agreement is geographically overbroad because its noncompete provision extends beyond Short's territory as a Lucernex employee. (Dkt. 16, at 14–15). The noncompete provision extends to "the state of Texas . . . any other State of the United States . . . [and] any country in the world where the Company engages or proposes to engage in Business."[5] (Dkt. 1-1 ¶ 8). There is no evidence in the record as to what Short's client or sales territories were, but there is evidence as to the states and countries in which Lucernex did business—Accruent General Manager of Retail Robert Abdul[6] testified that Lucernex had customers "all over the U.S., Canada, South America, and Europe, Asia." (Dkt. 29, at 30).

Accruent, meanwhile, asserts that the Agreement bars Short from working for a competitor in states or countries where *Accruent* does business. (Dkt. 10, at 4). Accruent asks the Court to bar Short from competing with Accruent "in any geographic location" because Short knows confidential information about customers and projects outside of his sales territory and the "nature of Short's work makes it impossible to confine his work territory to a particular area." (*Id.* at 4–5).

In other words, Short thinks that the noncompete provision is overbroad because it extends beyond Short's work territory, and Accruent thinks the provision should extend even more broadly. The parties' positions on the noncompete provision's geographic scope thus raise two issues: (1) how to interpret the provision's geographic scope, and (2) whether the provision's geographic scope, properly interpreted, is reasonable.

---

[4] One aspect of the Agreement that Short does not contest is its two-year duration. (*See* Dkt. 16, at 11–16 (arguing that the Agreement is unreasonable without discussing its duration)). Texas courts generally hold that two to five years is a reasonable duration for noncompete agreements. *Gallagher Healthcare Ins. Servs. v. Vogelsang*, 312 S.W.3d 640, 655 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ("Two to five years has repeatedly been held as a reasonable time in a noncompetition agreement.") (citing cases). Accruent General Manager of Retail Robert Abdul testified that the two-year period is derived from a typical software development timeline so as to protect proprietary information about newly developed products. (Dkt. 41). Accordingly, the Court finds that the Agreement's two-year duration is reasonable.

[5] The Agreement defines "Company" as "Lucernex, Inc." (Dkt. 1-1, at 5).

[6] Before Accruent's acquisition of Lucernex, Mr. Abdul served as the chief operating officer and interim chief executive officer of Lucernex. (Abdul Decl., Dkt. 10-1, ¶ 2).

As to the first issue, the Court does not agree that the noncompete provision extends to every country where Accruent does business. "In construing a contract, a court must ascertain the true intentions of the parties as expressed in the writing itself." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of America*, 341 S.W.3d 323, 333 (Tex. 2011). When contract language is unambiguous, the language expresses the parties' intent and it must be enforced as written. *E. Texas Copy Sys., Inc. v. Player*, 528 S.W.3d 562, 566 (Tex. App.—Texarkana 2016, no pet.). And "[w]hen contracting parties set forth their own definitions of the terms they employ, the courts are not at liberty to disregard such definitions and substitute other meanings." *Fulton v. Texas Farm Bureau Ins. Co.*, 773 S.W.2d 391, 392 (Tex. App.—Dallas 1989, writ denied).

Here, Short and Lucernex executed an agreement defining "Company" as "Lucernex, Inc." (Dkt. 1-1, at 5). The noncompete provision extends to "any country in the world where the Company engages or proposes to engage in Business." (*Id.* § 8). According to the parties' own definition, the provision sets its geographic scope according to the places that Lucernex did business. Moreover, the agreement's unambiguous reference to Lucernex indicates the parties' intent to set the scope of the provision according to Lucernex's geographic reach rather than that of an unidentified company that might later acquire Lucernex. And because an assignee "stands in the shoes" of the assignor, *Capitan Enterprises, Inc. v. Jackson*, 903 S.W.2d 772, 776 (Tex. App.—El Paso 1994, writ denied), Accruent can enforce only the rights that Lucernex possessed under the Agreement. At most, then, the Agreement bars Short from competing with Accruent in states or countries where *Lucernex* did business.

This brings the Court to the second issue, which is whether such a geographic scope is reasonable. "Generally, a reasonable area for purposes of a covenant not to compete is considered to be the territory in which the employee worked while in the employment of his employer." *Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d 787, 793 (Tex. App.—Houston [1st Dist.] 2001, no pet.)

7

Nonetheless, courts will uphold a national or global covenant whose scope exceeds an employee's territory when the scope is justified by the business interest underlying the covenant. *See, e.g.*, *Daily Instruments Corp. v. Heidt*, 998 F. Supp. 2d 553, 567–68 (S.D. Tex. 2014) (upholding a covenant extending to every country in which the employer did business where the global customer base was "very narrow" and the high-level employee had access to confidential information about customers and projects outside his territory).

A noncompete provision is reasonable when it does not "impose a greater restraint than is necessary" to protect the employer's legitimate business interest. Tex. Bus. & Com. Code § 15.50(a). Here, Accruent seeks to protect its interest in its confidential proprietary information: technical details about its products' functionalities, its development plans, its sales pipeline, its sales process, its customers' preferences, its relationships with its customers, and more. (Dkt. 10, ¶ 25). Because Short was Lucernex's senior solution engineer, he now has an "intimate knowledge of all Lucernex product functionality." (Abdul Decl., Dkt. 10-1, ¶ 8). Short knows about Lucernex's unreleased software and its roadmap for future product development. (*Id.*). He knows the product functionalities requested by Lucernex customers. (*Id.*). He knows Lucernex's business development plans, its market research, its sales goals, and its marketing strategy. (Dkt. 29, at 21–23 (Abdul testimony)).

The Court disagrees with Short that the noncompete must be limited to places where Short did work for Lucernex customers or prospects. Given everything Short knows about Lucernex and its products, customers, and prospects, Short can help a competitor take business from Accruent in any state or country where Lucernex did business. It is therefore reasonable for the noncompete provision to extend to every state or country in which Lucernex did business.

Second, Short argues that the noncompete provision's scope of activities is overbroad because it extends beyond the customers and prospects with whom Short worked at Lucernex. (Dkt.

8

16, at 12–13). Short argues that "it is well settled under Texas law that covenants purporting to prohibit activities with clients with whom the employee had no personal involvement are unreasonable and unenforceable." (*Id.* at 12 (citing *Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381, 386–88 (Tex. 1991)). The Court does not read *Haass* so broadly as to be conclusive in this case.

*Haass* concerned an accounting partner, his former accounting firm, and a restrictive contract provision that applied if Haass later did work for any of the firm's clients rather than applying only if Haass did work for his former clients. *Haass*, 818 S.W.2d at 382, 386. The Texas Supreme Court held that provision to be unreasonable because it was not reasonably necessary to protect the "business interest of preventing the former partner or employee from establishing rapport with the clients and upon termination taking part of the client base with him." *Id.* at 387. In other words, the holding in *Haass*—on which Short bases his interpretation of state law—is derived from the business interest that the contract provision in that case served to protect.

*Haass* thus stands for a narrower principle than Short describes. *Haass*'s principle is that when an employer's interest in an employee's noncompetition agreement derives from the employee's relationship with his or her clients, then a noncompete agreement is invalid if it applies to clients with whom the employee never had a relationship. Indeed, Texas appellate courts typically invoke *Haass* to invalidate noncompete agreements not limited to an employee's former customers only when the employee's value derived in large part from his or her customer relationships. *See Wright v. Sport Supply Grp., Inc.*, 137 S.W.3d 289, 298 (Tex. App.—Beaumont 2004, no pet.) ("[A] covenant not to compete that extends to clients with whom a salesman had no dealings during his employment is unenforceable.") (citing *Haass*, 818 S.W.2d at 386–88); *John R. Ray & Sons, Inc. v. Stroman*, 923 S.W.2d 80, 85 (Tex. App.—Houston [14th Dist.] 1996, writ denied) ("In the case of covenants applied to a personal services occupation, such as that of a salesman, a restraint on client solicitation is overbroad and unreasonable when it extends to clients with whom the employee had

9

no dealings during his employment.") (citing *Haass*, 818 S.W.2d at 386–88); *see also Stelly*, 733 F. Supp. 2d at 799 ("Texas courts are generally concerned about customer contract restrictions where the client base is the protectable business interest.") (citing *Haass*, 818 S.W.2d at 387).

Here, the business interest that Lucernex sought to protect is broader than the concern that Short might take his former clients with him. As discussed above, Short's role gave him access to confidential proprietary information concerning Lucernex's product functionality, development plans, sales pipeline, sales process, customer preferences, and market research. (Dkt. 10, ¶ 25). Moreover, a clause in the Agreement acknowledges that it would be difficult for Short to work for a competitor without disclosing or using the proprietary information he would acquire. (Dkt. 1-1, § 7.1). Animating the noncompete provision is therefore not only the concern that Short will use his rapport with his customers to take them with him to a competitor. It is also—and principally—the concern that Short will apply the knowledge he learned from and about Lucernex to help a competitor best Lucernex in the markets where Lucernex did business. The Court therefore disagrees that *Haass* compels the Court to find the noncompete provision's scope of activities unreasonable.

Finally, Short argues that the noncompete provision's scope of activities is overbroad because Short construes the Agreement to "prohibit[ ] Short from working for any competitor . . . regardless of whether any such role coincides with his former activities for Accruent/Lucernex." (Dkt. 16, at 12). That is, Short reads the Agreement to prohibit him from "emptying trash cans or cleaning toilets" for a competitor. (*Id.* at 13–14). Accruent agrees that the noncompete provision extends to a broad range of activities. Robert Abdul testified that Short would not violate the Agreement if he worked for Tango as "a janitor," but that he would violate the Agreement if he did "any work related to customers, product, software, implementations . . . anything related to . . . anything in our industry." (Dkt. 29, at 46–47 (Abdul testimony)). According to counsel for Accruent,

10

compliance the Agreement's noncompete provision is not determined by Short's role at his new company, but rather by the new company's competitive relationship with Accruent. (Dkt. 41).

The Court agrees with Short that noncompete agreements barring an employee from working for a competitor in *any* capacity are invalid. *McNeilus Companies, Inc. v. Sams*, 971 S.W.2d 507, 511 (Tex. App.—Dallas 1997, no writ); *see also Wright*, 137 S.W.3d at 298 ("A restrictive covenant is unreasonable unless it bears some relation to the activities of the employee."); *McKissock, LLC v. Martin*, No. EP-16-CV-400-PRM, 2016 WL 8138815, at *9 (W.D. Tex. Nov. 10, 2016) (finding a noncompete agreement unreasonable because it barred the employee from being "employed . . . *in any manner* with any business or practice which is in competition with [the employer]") (emphasis in original).

In *McKissock*, the court reformed the overbroad agreement so that it would instead only prohibit the employee "from providing services to a competitor that are similar to those that she provided to [her former employer]." *Id.* Specifically, the court reformed the agreement so that the employee, who developed and taught courses on insurance appraisal, was prohibited from developing and teaching appraisal courses but could still "work in the insurance industry generally and even the insurance appraisal field specifically." *Id.* at *11.

The Court will take the same approach here. The Agreement's noncompete provision prohibits Short from "compet[ing] with the Company in Business," defining "Business" as only "those portions of the Company's business in which [Short] actively participated or received Proprietary Information." (*Id.*). Accruent interprets the provision to bar Short from working for a competitor in nearly any capacity, which under Texas law is unreasonable. The Court must therefore reform the Agreement.

In reforming the Agreement, the Court must make modifications only "to the extent necessary to cause the limitations . . . to be reasonable and to impose a restraint that is not greater

11

than necessary" to protect Accruent's business interest and enforce the reformed Agreement. Tex. Bus. & Com. Code § 15.51(c). The Court's reformation, therefore, must be tailored to Accruent's asserted business interest in safeguarding its confidential proprietary information from being put to use for a competitor's advantage without sweeping so broadly as to prohibit Short from working for a competitor in any capacity.

Pending dispositive motions or a trial on the merits, the Court will reform the Agreement's noncompete provision as follows. In the clause defining "Business" at the end of Section 8 (entitled "Post-Employment Non-Compete Agreement"), the Court removes the phrase "or received Proprietary Information." As reformed, the noncompete provision is therefore limited to "those portions of [Lucernex's] business in which [Short] actively participated." The reformed noncompete provision prohibits Short from competing or being employed by a competitor only if the role in which Short competes or is employed is the same or substantially similar to the roles he performed for Lucernex.

### 2. Likelihood of success on the merits with respect to the reformed Agreement

Short also argues that even if the Agreement is enforceable, he is not violating the Agreement because he is not competing with Accruent. (Dkt. 16, at 15). Specifically, Short argues that because he only helps existing Tango customers implement and use Tango's proprietary software, he has no incentive or opportunity to use Accruent's confidential proprietary information to help Tango compete with Accruent. (*Id.*).

To that end, Short testified that he has not used any confidential proprietary information belonging to Accruent in his new role at Tango. (Dkt. 41). Short says that Tango uses a different methodology to implement its software and that he handles Tango customers' issues without relying on anything but Tango's proprietary information. (*Id.*). Both Short and Tango CEO Pranav Tyagi state that Short has been walled off from any projects for former Lucernex customers or prospects

12

and that Short has signed an agreement with Tango not to use any confidential Lucernex information while working for Tango. (Dkt. 16-1, at ¶¶ 19–20; Dkt. 22-1, at ¶¶ 8–11).

Accruent, meanwhile, argues that Short cannot help but use confidential proprietary information belonging to Lucernex in his role at Tango. Accruent Senior Vice President Greg Rivera testified that, based on his experience in the software industry, Tango cannot practically wall off Short from Tango's salespeople and developers. (Dkt. 41). Robert Abdul testified that because Tango and Accruent are both in business to solve the same types of problems—and in some cases, the same exact problems—for the same types of customers, Short will be unable to help Tango customers solve their problems without using knowledge he gained while working for Lucernex. (Dkt. 41). According to Accruent, in other words, the question is this: when Short's colleagues and customers come to him with an issue with Tango's products or with a problem they would like Tango's products to solve, is it realistic to believe that Short might know how to resolve that issue using confidential proprietary information he learned at Lucernex, but that he would ignore that knowledge even if it meant resolving the problem in an inferior way or not resolving it at all?

The Court is persuaded that it is unlikely, given the similarity between the two companies, the similarities between Short's role at Tango and his role at Lucernex, Short's seniority at Lucernex, and Short's level of exposure to Lucernex's confidential proprietary information, that Short can perform his job at Tango without using confidential proprietary information that now belongs to Accruent. Short cannot unlearn the problems and solutions he learned at Lucernex. When confronted with similar problems for similar customers at Tango, it is not realistic to think that Short will ignore his experience. *See TransPerfect Translations, Inc. v. Leslie*, 594 F. Supp. 2d 742, 757 (S.D. Tex. 2009) ("Where there is a high degree of similarity between the employee's former and future employer, it becomes likely, although not certain, that the former's confidential information will be used and disclosed in the course of his work.").

13

On a more fundamental level, Short is working for Tango in a role similar to his first position at Lucernex. In that capacity, he is helping a direct competitor implement the same kinds of products to solve the same kinds of problems for the same kinds of clients. Even if Short only helped Tango customers optimize their use of Tango products, Short's success in serving those customers makes it less likely that they would turn to Accruent for solutions instead. Even if Short never disclosed Accruent's confidential proprietary information, he would violate the reformed Agreement by doing the same or similar job for a direct competitor in states or countries where Lucernex did business. Accruent has shown a substantial likelihood that Short will do so and has therefore shown a substantial likelihood of prevailing on the merits under the reformed Agreement.

*B. Irreparable Harm*

Accruent states that it faces irreparable injury if Short is allowed to use his knowledge of Accruent's proprietary information to compete with Accruent and "interfere with numerous high value potential deals." (Dkt. 10, at 6–7). Short, meanwhile, argues that Accruent has failed to meet its burden to show that Short's conduct will harm Accruent at all, much less that any harm is not remediable by damages. (Dkt. 16, at 17). The Court agrees with Accruent that Accruent faces irreparable harm from Short's conduct.

An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured. *Wright*, 137 S.W.3d at 292. In Texas, injury resulting from the breach of a noncompete agreement "is the epitome of irreparable injury, so enforcement appears to be the rule rather the exception." *Sirius Comput. Sols., Inc. v. Sparks*, 138 F. Supp. 3d 821, 841 (W.D. Tex. 2015) (citation and quotation marks omitted); *see also TransPerfect Translations*, 594 F. Supp. 2d at 757 ("The use of an employer's confidential information and the possible loss of customers is sufficient to establish irreparable harm."). Texas courts therefore recognize a presumption of irreparable injury upon "[p]roof that a highly trained employee is continuing to breach a non-

14

competition covenant." *Cardinal Health Staffing Network, Inc. v. Bowen*, 106 S.W.3d 230, 236 (Tex. App.—Houston [1st Dist.] 2003, no pet.).

Here, Short is a highly trained employee. He was a senior engineer who understood Lucernex's products in sufficient detail to help Lucernex clients understand how to implement the product and to convey to prospects how the product could benefit them. (Dkt. 10-1, at ¶¶ 7–9). Tango, his new employer, creates software products to help retail businesses select, obtain, and manage real estate and facilities. (*Id.* ¶ 13). Lucernex and Accruent, his former employers, are engaged in the same business. (Dkt. 10, ¶ 1). Given the high degree of similarity between Tango and Accruent, and given the breadth of proprietary information to which Short's training gave him access, it is likely that Short will be unable to avoid disclosing or using Accruent's confidential proprietary information for Tango's benefit, and a presumption arises that Accruent's injury will be irreparable. Short has not rebutted that presumption.[7]

### C. Balance of Equities

Accruent must also establish that its irreparable harm is greater than the hardship that the preliminary injunction would cause Short. *Sirius Computer Sols.*, 138 F. Supp. 3d at 842. Robert Abdul testified that Short could significantly harm Accruent by helping Tango outmaneuver Accruent to realize emerging business opportunities, such as helping customers comply with new accounting standards. (Dkt. 41). The Court has already found, moreover, that Short's role at Tango puts Accruent at risk of irreparable harm from the loss of business opportunities.

Short, meanwhile, testified that because his work experience is niche, he would earn less by working outside the industry occupied by Accruent and Tango. (*Id.*). Short also testified that

---

[7] In the Court's preliminary injunction hearing, Short pointed to testimony from an Accruent employee at the TRO hearing stating that Accruent would be able to quantify the harm that Short could cause Tango by extrapolating from lost revenues. (Dkt. 29, at 67 (Robb testimony)). That employee later qualified his testimony at the preliminary injunction hearing by testifying that a number of assumptions would need to be made in estimating lost revenue from poached existing or potential customers and that any estimates of damages would be highly imprecise. (Dkt. 41 (Robb testimony)). In light of the witness's complete testimony, the Court finds that money damages could not be estimated with sufficient precision to "fully repair the harm." *Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986).

15

maintaining medical insurance coverage is important to him and his family because his wife has a serious medical condition. (*Id.*).

While the Court is sympathetic to Short's desire to maximize his income and maintain his health insurance, Short's testimony lacks sufficient specificity for the Court to measure the harm he anticipates. Short has neither provided the Court with evidence of how much less he might earn in a different industry nor explained what diminished earning would mean for his family. Meanwhile, Accruent presented evidence that Short earned $138,000 to $155,000 in recent years, (Pl.'s Ex. 23, Dkt. 41, at 1), and that he received over $200,000 when Accruent acquired Lucernex—half of which was a discretionary bonus on top of the value of his stock option. (Dkt. 41 (Abdul testimony)).

Finally, to the extent that Short risks losing money by working in a different industry, it is a risk that Short took with open eyes. Short chose to go to work for a direct competitor, showed his new employer the Agreement, and ultimately accepted a job offer that had changed after Tango reviewed the Agreement. (*Id.* (Short testimony); Pl.'s Ex. 5 (first offer letter); Pl.'s Ex. 6 (second offer letter)). Greg Rivera testified that in his 25-year career in the software industry, he has avoided violating noncompete agreements by changing industries when he changed jobs. (Dkt. 41). Under the reformed Agreement, Short can continue to work in the software industry generally. Under the reformed Agreement, Short can even work in the retail lease management and accounting software industry specifically, so long as he does so either (a) in a role that is not the same or substantially similar to his roles at Lucernex or (b) in a state or country in which Lucernex did not engage or propose to engage in business. For all of these reasons, the Court concludes that the irreparable harm that Accruent stands to suffer is greater than the harm to Short.

### D. *Public Interest*

It is in the public interest to uphold a reasonable noncompete agreement and provide a remedy created by Texas law. *Sirius Computer Sols.*, 138 F. Supp. 3d at 841 ("Upholding reasonable

16

non-competes is within the public interest."); *McKissock*, 2016 WL 8138815, at *13 ("Texas has clarified the public interest through its noncompete statute, and . . . enforcing reasonable non-compete agreements is within the public interest.") (citation omitted). Granting this preliminary injunction will not disserve the public interest.

## IV. CONCLUSION

The foregoing order constitutes the Court's findings of fact and conclusions of law. For the reasons discussed above, **IT IS ORDERED** that:

1. Plaintiff's Application for Temporary Restraining Order and Preliminary Injunction, (Dkt. 10), is **GRANTED** only insofar as the Court will enter the following preliminary injunction. Any request for relief not granted is denied.

2. Until the Court enters judgment in this case, or until the Agreement's provisions cease to apply, Defendant Jim Short is hereby enjoined to comply with the Agreement as reformed in this order. Specifically, Short is enjoined from working for an Accruent competitor in a position that is the same or substantially similar to his positions at Lucernex—which includes his current position at Tango—if his work involves clients or prospects located in states or countries in which Lucernex engaged or proposed to engage in business.

3. Pursuant to Federal Rule of Civil Procedure 65(c), Plaintiff is required to post a $30,000.00 bond.

**SIGNED** on January 4, 2018.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE